Affirmed as Modified and Opinion filed December 5, 2002









Affirmed
as Modified and Opinion filed December 5, 2002.

 




 
 
 
  
 
 
 




In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-01-00459-CV

____________

 

BARBARA NAVA BARRIENTOS, Appellant

 

V.

 

JOSIE MORENO NAVA, Appellee

 



 

On Appeal from the 257th District Court

Harris County, Texas

Trial Court Cause No. 98-11651

 



 

O P I N I O N








This is a dispute about money and who will control the
money.  The money was from two accounts
owned by Reno Nava:  a retirement account
and a life insurance policy.  When Reno
died, his ex-wife, Josie, wanted control of these funds to replace child
support Reno was supposed toCbut did notCprovide for the children. 
Reno=s sister, Barbara, claimed that Reno
made her trustee of these funds for his two children and that she should
control them.  Barbara appeals from a
judgment in which the family law judge held that she could no longer control
the funds and made Josie trustee over the funds.  In this appeal, we address three broad
issues.  First, we consider whether the
family court had jurisdiction over the subject matter, parties, and
property.  Second, we discuss three trust
issues:  (a) whether Reno created trusts
over these two accounts, (b) whether Barbara was properly removed as trustee,
and (c) whether Josie was properly substituted as trustee.  Third, we weigh Barbara=s claim that the trial court was
improperly biased.  We find that (1) the
court had jurisdiction over the initial support issues brought before it and
that it had jurisdiction as a district court over the additional party and
property brought before it, (2) Reno Nava did create trusts and that Barbara
was properly removed as trustee and Josie properly substituted, and (3) the
court was not improperly biased. 
Consequently, we affirm the judgment of the court, with some
modifications. 

I.          Factual
and Procedural Background

A.        
Factual Background

Josie and Barbara are former sisters-in-law.  Josie was married to Barbara=s brother, Reno Nava.  Josie and Reno had two children, Tyler and
Brooke.  In 1995, Josie and Reno were
divorced.  At the time of the divorce, Reno
had a $50,000 insurance policy with the Knights of Columbus (the “KOC”
policy).  The final divorce decree
obligated Reno to pay Josie child support for the children and to maintain, as
additional child support, the $50,000 KOC life insurance policy, naming the
children as beneficiaries and Josie as trustee.[1]

Reno did not comply with the decree=s order to name his children
beneficiaries of the KOC policy; instead, he named his mother, Margaret Nava,
and his father as the beneficiaries. 
Josie was unaware of this.  It was
her understanding that Reno “had taken care of the matter.”  She was also reassured by a copy of a 1993
designation form naming her and Tyler as beneficiaries of the KOC policy.








In addition to the KOC policy, Reno had retirement benefits
with the Texas County and District Retirement System (the “TCDRS annuity”).  Although the record does not include the
specific order, the divorce decree undisputedly provided that Reno retained
100% of those benefits after the divorce. 
After the divorce, Reno also acquired a $15,000 life insurance policy
with Blue Cross/Blue Shield (the “BCBS policy”).  

The designation forms for both the TCDRS annuity and the BCBS
policy named Reno=s sister Barbara as “trustee” for the beneficiaries, Tyler
and Brooke.  

In August of 1997, Reno died of brain cancer.  Several days after his funeral, a KOC
insurance agent met with Reno=s sister, Barbara, and his mother, Margaret, at a
restaurant.  There, Barbara learned that
Margaret was designated as a beneficiary of the KOC policy proceeds.  In fact, during the meeting, Margaret filled
out a form to claim the proceeds.  The
KOC policy proceeds were paid to Margaret in September,[2]
and she quickly spent most of the money on herself.  

After Reno=s death, Josie and Barbara spoke frequently over the phone
about the TCDRS annuity, worth approximately $20,000, and the BCBS policy.  Because Barbara was handling those funds,
Josie assumed Barbara was also handling the KOC policy.








Josie did not learn that Margaret was designated as the
beneficiary of the KOC policy until early December 1997.  When Josie specifically asked Barbara about
the policy, Barbara stated only that Josie would have to speak to Margaret
about it.  Barbara did not tell Josie
about the meeting with the KOC agent or that Margaret had claimed the
benefits.  Shortly thereafter, Josie discovered
that Margaret had already spent half of the money.  At a Christmas party Barbara hosted for Tyler
and Brooke, Josie showed Barbara the divorce decree and told her, Margaret, and
another sister of Reno=s, Janet, that she believed the $50,000 belonged to the
children.  Margaret and the sister then
left, and Josie and Barbara agreed that Barbara would be the “mediator” to
resolve the matter and obtain the return of the children=s money.  However, when Josie telephoned Barbara in the
weeks following the party, Barbara told her that she was unable to contact
Margaret.  Barbara then dropped the
matter, and made no further effort to assist Josie. 

Unable to resolve the matter through Barbara, Josie sued
Margaret to recover the KOC policy benefits. 
Josie later added Barbara and her sister, Janet, as defendants.  By the time the remaining benefits were
located, only $10,000 was left.  Josie
eventually settled with Margaret and Janet, and proceeded to trial against
Barbara.

B.        Procedural
History

The case was tried to the court without a jury.  At trial, Josie argued that Reno attempted to
designate Barbara as “trustee” for the children on the BCBS policy and the
TCDRS annuity, but that he was unsuccessful and did not create valid
trusts.  She claimed she was entitled to
the funds as equitable relief to replace the loss of the $50,000 KOC policy
that was intended to be additional child support.  In the alternative, she argued that Barbara
should be removed as trustee because she was not competent to manage the trust
funds, and she had acted with such hostility toward Josie that it interfered with
her ability to properly perform her duties as trustee.

C.        The
Judgment and Findings of Fact

The trial court ruled in favor of Josie, and entered a
judgment ordering that “[w]hatever the legal status of the alleged trust[s] may
be,” Barbara be removed as trustee and all proceeds of the BCBS and TCDRS funds
be delivered to Josie as trustee for the minor children, Tyler and Brooke.  The judgment also recited that “[t]here is
evidence before the Court that Barbara Nava Barrientos . . . has dealt in
hostility and bad faith.”  








The trial court also issued numerous findings of fact and
conclusions of law.  The relevant
findings of fact are summarized as follows: 
(1) according to the divorce decree, Josie was entitled to receive the
proceeds of the KOC policy as child support and be named “trustee for the
benefit of the children”; (2) in failing to change the beneficiary on the KOC
policy, Reno did not comply with the divorce decree, and, moreover, he falsely
represented to Josie that he had changed the beneficiary designation; (3) Reno
made the false representations to deceive Josie and prevent her from applying
to the court for enforcement of the divorce decree=s requirement that the beneficiary be
changed; (4) Barbara participated in a restaurant meeting with the Knights of
Columbus insurance agent and knew there was an issue regarding the beneficiary
designation; (5) Barbara Adeliberately misled Josie@ about the KOC policy while Margaret
spent all but $10,000 of the proceeds, and was part of the fraud against Josie;
(6) at the time of Reno=s death, the beneficiaries of the BCBS and TCDRS funds were
the minor children, Tyler and Brooke Nava, with Barbara as trustee of the funds
for their benefit, (7) Barbara “made no reasonably prudent decisions” about
investing the proceeds, was unable to state how she would invest the proceeds,
showed no ability to administer the proceeds to the best interests of the
children, and showed a lack of appropriate investment knowledge; and, lastly,
(8) Josie was “business-like,” had knowledge of appropriate investments, and
generally had demonstrated her capability to invest the monies on behalf of the
children.  

The trial court also found that “Josie Moreno Nava has not
shown hostility to Barbara Nava Barrientos, but Barbara Nava Barrientos has
shown such hostility that (a) Barbara Nava Barrientos= administrative plans (or lack
thereof) for the [BCBS policy and the TCDRS annuity] have been affected, and
(b) Barbara Nava Barrientos has not been able to think and act as a fiduciary
should . . . .”  Accordingly, the trial
court found that it was in the best interests of the children that Barbara be
removed as trustee and Josie receive the BCBS and TCDRS funds directly as
trustee for the minor children.  








In accordance with additional findings that there were no
definite trust terms, the trial court also entered conclusions of law that Reno=s designation of Barbara as “trustee”
of the BCBS and TCDRS funds was not sufficient to create a trust, the trust
failed for lack of definiteness, and the funds were not trust funds.  However, the court also concluded it had the
equitable power and authority to remove Barbara as trustee and name Josie as
trustee, in order to partially compensate Josie for the loss of the KOC policy
proceeds and put her and the children in “as close a position as possible to
where they would have been” had Reno complied with the court=s divorce decree regarding the KOC
policy. 

This appeal followed.  

II.        Issues
raised on Appeal

Barbara raises thirty-four issues on appeal.  They fall into three categories:   jurisdictional issues, trust issues, and
improper bias of the trial court.  

The overarching jurisdictional claim involves both an attack
on the court=s subject matter and in personam
jurisdiction, and a claim that the court could not take any action regarding
the retirement policy and annuity because Reno=s estate was a necessary party to the
action but was not joined. 

After discussing the jurisdictional issues we will turn to
the trust issues.  Three general trust
issues exist:  (1) whether a trust was
created; (2) the removal of Barbara as trustee; and (3) the substitution of
Josie as trustee.  

The third and last issue is whether the trial court was
swayed by improper bias against Barbara. 

A.        The
Jurisdictional Issues








Josie filed her lawsuit against Margaret, and, later, Barbara
and Janet, in the family court that adjudicated Josie and Reno=s divorce.  In her petition, she alleged that
jurisdiction was proper based on the court=s continuing jurisdiction to enforce
the provisions of the divorce decree and its pendent and ancillary jurisdiction
over related issues.  She also alleged
the court had jurisdiction over matters involving trusts.  On appeal, Barbara contends that the trial court
(1) lacked jurisdiction because this was strictly a property issue and not a
support issue, (2) lacked jurisdiction to adjudicate any part of the case
because Reno=s estate was not made a party to the
dispute, and (3) lacked jurisdiction over Barbara[3]
because she was not a party to the divorce. 
Before we can address these claims, we must first review the family
court=s general jurisdiction.  After that, we will weigh each claim in turn.

1.         A Review of
the Family Court=s Specific and General Jurisdiction 

Continuing, exclusive jurisdiction is acquiredCand retainedCby a court when it renders a final
order in an original suit affecting the parent‑child relationship.  Tex.
Fam. Code Ann. '' 155.001(a), 155.002. 
Once a court has acquired continuing, exclusive jurisdiction, no other
court can obtain jurisdiction, unless the case is appropriately transferred or
there is an emergency.  Id. '' 155.001(c), 155.201B.207 (transfer provisions), 262.002
(jurisdiction for emergency proceedings). 
And, the Family Code also gives the family court continuing jurisdiction
to modify its support orders.  Tex. Fam. Code Ann. ' 155.003(a).  Additionally, the Family Code liberally
provides for joinder of claims in a suit affecting the parent-child
relationship.  Tex. Fam. Code Ann. ' 157.003(a) (allowing for joinder in
the same proceeding of any claim and remedy provided for under the Family Code
or “other rules of law”); see also Moore v. Sanders, 106 S.W.2d 337, 338
(Tex. Civ. App.CSan Antonio 1937, no writ) (finding that suit to remove
trustee and suit to make allowances from corpus of trust for maintenance of
beneficiaries were properly joined). 

In addition, Texas law greatly discourages the multiplicity
of suits, preferring that all disputes between the parties over the same
subject matter be settled in one suit. 
This general doctrine is recognized in all existing systems of
jurisprudence, but applied in Texas with particular force.  See Moore, 106 S.W.2d at 338. 

2.         This was a
Valid Exercise of the Family Court=s Continuing, Exclusive Jurisdiction 

 

We start with the proposition that the family district court
had authority to modify the child support orders contained in the original
divorce decree.  We now consider whether
Barbara has presented a valid reason why the court could not exercise its continuing,
exclusive jurisdiction.

Barbara complains that the trial court did not have
jurisdiction for three reasons.  First,
this was a suit involving property division, and the court had lost its
jurisdiction to divide property of the marital estate.  Second, Reno=s estate was not made a party to the
suit, so the court did not have authority over the property.  Third, the court had no continuing
jurisdiction over Barbara, Margaret, or the two trusts because neither the property
nor the persons were part of the divorce proceedings.  We will address each of these claims.

a.         This was not
a suit for property division 

First, Barbara claims this is a suit involving property
division.  We have reviewed the petition
and we disagree.  The petition clearly
sets forth that Josie brought suit because Reno failed to designate his
children the beneficiaries of a life insurance policy.  As alleged in the suit, the policy was to
provide them $50,000 in child support upon his death.  Consequently, this suit was brought to
replace child support that was lost when Reno violated the court=s order regarding support.  Moreover, as noted earlier, initially, Josie
sued only Margaret over the KOC policy. 
She requested a temporary restraining order and temporary injunction
enjoining Margaret from wasting the KOC assets, noting that the KOC policy was
designated as child support for the children. 
Clearly, the court had continuing exclusive jurisdiction over this child
support claim.  Tex. Fam. Code Ann. ' 155.002; Fleming v. Easton,
998 S.W.2d 252, 254 (Tex. App.CDallas 1999, no pet.).








But, even if the court may have continuing exclusive
jurisdiction over the child support, Barbara claims that the court did not have
power to exercise jurisdiction because (1) Reno=s estate was not brought into the
suit before the family court; and (2) Margaret, Barbara, and the BCBS policy
and TCDRS annuity were not parties to or part of the divorce proceedings.  

b.         No proof that
Reno=s estate (if there was one) was a
necessary party

 

Barbara is right that Reno=s estate was not made a party to the
action.  However, the record does not
contain evidence that an estate was probated or, if so, who its representative
was.  The record contained some evidence
that Reno died intestate; the record contains no evidence that there was an
administration of the estate, nor any evidence that an application of any kind
was filed in probate court.  See Tex. Prob. Code Ann. ' 178(b) (“No administration of any
estate shall be granted unless there exists a necessity therefor, such
necessity to be determined by the court hearing the application.”).  Barbara does not maintain that there was an
administrator who should have been joined or otherwise claim that a particular
person could represent the estate. 
Moreover, when the case was tried to the court, there was no showing
that the estate was in a probate court, that any individual was granted a
letter of administration, or that any other person should be a party.  Consequently, the record supports the
conclusion that the court had before it the only people who had any interest in
the proceedings or assets:  Margaret
Nava, Reno=s mother, who was wrongly designated
beneficiary of the KOC policy; Barbara, the only person other than the children
who had any interest in the BCBS and TCDRS funds; the children; and Josie.  We overrule Barbara=s claim that the court needed to have
any additional parties in court before it had jurisdiction over the property
and parties.

c.         The court had jurisdiction over Barbara and the two accounts








Finally, we turn to Barbara=s claim that the court did not have
jurisdiction over her or the properties (the BCBS policy or the TCDRS annuity),
neither of which were subject to the divorce decree.  She claims that the court overreached when it
exercised jurisdiction over her and this property.

At first glance, it may seem that the court overreached for
the reason Barbara alleges.  Barbara was
not a party to the divorce, and neither of the two funds was designated as
child support in the divorce decree.  In
fact, the BCBS policy was purchased after the divorce.  However, for two reasons, we believe the
Family Code supports jurisdiction here. 
First, the Code provides that the court has continuing exclusive
jurisdiction over child support issues.  Tex. Fam. Code Ann. ' 155.001B155.003.  This suit initially involved a child support
obligation that Reno did not fulfill.  No
other court would have had jurisdiction to resolve that child support issue.  Id. 
In fact, the concept that a family court continues its jurisdiction over
support issues is so strong that even if a family court loses its continuing,
exclusive jurisdiction to modify its order regarding support, it still retains
the power to enforce its order for violations that occurred prior to the time
it lost continuing, exclusive jurisdiction. 
Id. ' 155.004.  Consequently, with the filing of the original
petition for injunction, declaratory judgment and damages, the family court had
authority to hear the case.  Barbara and
the accounts at issue here were not joined until after the family court had
already acquired jurisdiction over the case. 
Josie=s claims against Barbara and this
property were based on an attempt to recoup the lost child support and,
factually, were intimately connected with the original suit.  Moreover, although Josie maintained that
these properties were not trusts for her children, clearly the children were
mentioned in the accounts and were the apparent beneficiaries.  Thus, from a practical perspective and in
furtherance of judicial economy, if there was a dispute about these accounts,
it made sense for the court to hear these issues with the others it had before
it.  








It also made sense legally for the court to hear and decide
these issues, which leads us to the second reason the trial court had
authority.  As a court of general
jurisdiction in which family matters merely take precedence, the family
district court was clearly permitted to hear and decide the trust issues in
this case.  See Tex. Gov=t Code Ann. ' 24.601(a) (“A family district court
has the jurisdiction and power provided for district courts by the constitution
and laws of this state.”); Tex. Prop.
Code Ann. ' 115.001(a)(3) (“[A] district court has original and
exclusive jurisdiction over all proceedings concerning trusts, including
proceedings to appoint or remove a trustee.”); Tex. Prob. Code Ann ' 5(e) (“A statutory probate court has
concurrent jurisdiction with the district court . . . in all actions involving
an inter vivos trust . . . .”).  

Consequently, the court had jurisdiction to resolve the
support issue initially brought before it; the court also had jurisdiction to
resolve the trust issues which later arose. 
Barbara was a necessary party to the trust issues and to the support
issues, and therefore the court had jurisdiction over her.[4]

We have read the cases Barbara cites in support of her claim
that the court did not have jurisdiction. 
See Peirce v. Sheldon Petroleum Co., 589 S.W.2d 849 (Tex. Civ.
App.CAmarillo 1979, no writ); Qwest
Microwave, Inc. v. Bedard, 756 S.W.2d 426 (Tex. App.CDallas 1988, no writ).  Neither case involves child support orders or
the family court=s broad powers and continuing exclusive jurisdiction to hear
matters.  Peirce was brought in a
civil district court and involved business transactions; Qwest was a
probate proceeding that also involved business transactions.  Because these cases were not brought in a
family court that had jurisdiction over the child support issue and the ensuing
trust issue, and because they do not involve child support issues, they are
distinguishable and not noteworthy for our purposes.

In summary, we overrule Barbara=s first issue alleging that the court
lacked jurisdiction over the property and the parties.

B.        THE TRUST ISSUES

Having determined that the trial court had jurisdiction over
this case, we now consider the trust issues in the case.  First, was a trust created?  Under this section we will discuss (a) the
particular designations Reno made, (b) how a trust is created and what type of
trust this was, and (c) whether the trust was vague in one of several
ways.  Under this third part, we will
also review and distinguish cases Josie cites. 
Second, we will consider whether the court properly removed Barbara as “trustee.”  Third, we will review the court=s appointment of Josie as trustee. 

1.         Was a Trust
Created?

a.         The
designations Reno made

Before discussing the trust issues, we will first review the
designations Reno made in the two accounts. 
Understanding how the designations were written on the forms helps
clarify our later discussion.  Reno made
two designations that are at issue here. 
The first is contained in the BCBS policy.  That form contains a line for the insured to
designate a “primary beneficiary.”  It
asks for the beneficiary=s full name, the beneficiary=s relationship to the insured and the
beneficiary=s date of birth.  Reno filled out this line in the following
way.  On the top half of the space Reno
wrote “Barbara Nava Barrientos.”  The
bottom half of the space contained this information:  “Trustee for minor children Tyler & Brooke
Nava Children 7-17-92 Tyler 2-16-94 Brooke.” 
The TCDRS beneficiary form asked for the same information plus an
address.  Reno filled out this form with
the same information as the BCBS policy plus an address that appears to have
been his.




b.         Creation of a
trust

(1)       The
relevant law








The Texas Trust Code states that a trust may be created in
one of five ways:  (1) a property owner=s declaration that the owner holds
the property as trustee for another person; (2) a property owner=s inter vivos transfer of the
property to another person as trustee for the transferor or a third person; (3)
a property owner=s testamentary transfer to another person as trustee for a
third person; (4) an appointment under a power of appointment to another person
as trustee for the donee of the power or for a third person; and (5) a promise
to another person whose rights under the promise are to be held in trust for a
third person.  Tex. Prop. Code Ann. ' 112.001.

No particular form of words is required to create a
trust.  However, to create a trust a
document must be reasonably certain as to the putative trust=s property, its object, and the
beneficiary.  Colton v. Colton,
127 U.S. 300, 310B11, 8 S. Ct. 1164, 1168B69, 32 L. Ed. 138 (1888); Tomlinson
v. Tomlinson, 960 S.W.2d 337, 338 (Tex App.CCorpus Christi 1997, pet. denied)
(citing Fred Rizk Const. Co. v. Cousins Mortg. & Equity Invs., 627
S.W.2d 753, 757 (Tex. App.CHouston [1st Dist.] 1981, writ ref=d n.r.e.) and Kurtz v. Robinson,
279 S.W.2d 949, 952 (Tex. Civ. App.CAmarillo 1955, writ ref=d n.r.e.)).  We look to the settlor=s intent to determine whether a trust
was created.  See Tex. Prop. Code Ann. ' 112.002 (“A trust is created only if
the settlor manifests an intention to create a trust.”).

The dispute here centers on two issues.  First, do the designations fall under one of
the five methods of creating a trust and, second, even if they do fall under
one of the five categories, does the trust fail for vagueness?  Both parties seem to agree that, if any of
the categories apply here, only the inter vivos transfer applies. 

(a)       This was an
inter vivos transfer








Barbara maintains that Reno=s designations on his insurance and
benefit forms were inter vivos transfers of property; Josie claims that they
were not.  To resolve this issue, Barbara
has cited us to Tomlinson v. Tomlinson, whose facts are very close to
ours.  In Tomlinson, like here,
the father listed his children as designated beneficiaries of his death
benefits from a company profit sharing plan. 
See Tomlinson, 960 S.W.2d at 337B38. 
Like here, father designated his sibling trustee for the death
benefits.  See id. at 338.  Like here, aside from this designation on his
profit sharing plan form, there is no other trust instrument. See id.  With very little explanation, the court
concluded that the designation was an inter vivos transfer.  See id.  Josie claims that we should consider Tomlinson
an aberration in Texas law and refuse to follow it.  For the following reasons, we decline to
treat Tomlinson as an aberration.

Although there is very little in Texas law to guide us on
this issue, several Trust Code provisions contemplate that death benefits and
life insurance proceeds are appropriate trust property.  In the definitions section for trusts, “property”
means “any type of property Y, including a contractual right to receive death benefits as
designated beneficiary under a policy of insurance, contract, employees= trust, retirement account, or other
arrangement.”  Tex. Prop. Code Ann. ' 111.004(12).  In a later section, death benefits are again
specifically mentioned as being transferable to a trust:  “A death benefit is payable to a trustee of a
trust evidenced by a written instrument or declaration existing on the date of
an employee=s . . . death, . . . if the
trustee is designated as beneficiary . . . under the retirement account.”  Tex.
Prop. Code Ann. ' 121.052(a).








The Restatement (Second) of Property also specifically
recognizes the designations that Reno made as inter vivos transfers.  See Restatement
(Second) of Property ' 32.4 (1990).  As the
Restatement (Second) explains, these types of transactions are considered will
substitutes.  See id.  For example, when life insurance is owned by
the insured, and he directs the insurance company to pay the insurance proceeds
on his death outright to either a named person or the trustee of a trust, “the
pay-out arrangement, though revocable by the insured, is an inter vivos
donative document of transfer that is a substitute for a will.”  See id. cmt. f.  The Restatement (Second) of Property also
recognizes an employee death benefit designation as an inter vivos donative
document of transfer.  See id. cmt. h
(AThe designation by the employee of
the person or persons to receive such benefits on the death of the
employee,  though revocable by the
employee, is an inter vivos donative transfer and is a substitute for a will.@).[5]

We conclude that the designations on the BCBS and TCDRS forms
were inter vivos donative transfers and thus a recognized method of creating a
trust.

(2)       The
designations were not too vague

Having concluded that these were inter vivos donative
transfers, we now turn to the second half of our questionCwhether the trust failed for
vagueness.  Again, as we explain below,
we agree with the Tomlinson court that the designations do not fail for
vagueness because (1) the designations are clear as to who the beneficiaries
are and (2) the unique circumstances of this relationship and the property code
provide sufficient details to overcome a vagueness claim.  Finally, we will review the cases Josie cited
and explain why they are not controlling here.

(a)       The designations of the beneficiaries were not too vague 

The designations are clear that Reno was designating his
children as beneficiaries and Barbara as a mere trustee.  The designation forms asked for specific
information on the beneficiaries, such as relationship to the donor, date of
birth and gender.  On both the forms, the
responses to these questions gave information on the children, not on
Barbara.  Only Barbara=s name, followed by the word “trustee,”
appears on the forms.  No other
information about Barbara is given. 
Thus, it seems unmistakable that Reno intended Barbara to hold the
property in trust for the intended beneficiariesCReno=s two children.

(b)       The purpose
of the trust is not too vague

That leaves us to determine whether sufficient details on the
purpose of the trust and the duties of the trustee exist so that the trust does
not fail for vagueness.  In this
situation, with minor children, we think it very reasonable to conclude that
Reno intended the money to be used for the general welfare of his children,
which could include both daily maintenance and special expenditures.  

Moreover, the Trust Code supplies additional details so the
trustee can act and can be held accountable for her actions.  Section 113.006 of the Code gives the trustee
the authority to manage trust property and invest and reinvest the funds on the
conditions and for length of time as the trustee sees fit.  Tex.
Prop. Code Ann. ' 113.006.  Section
113.021 authorizes the trustee to distribute funds from the trust to
minors.  Id. ' 113.021.  Section 113.056 requires the trustee to
exercise the judgment and care that persons of ordinary prudence, discretion,
and intelligence exercise in their own affairs regarding permanent funds.  Id. ' 113.056.  Finally, section 114.001 holds the trustee
accountable to the beneficiary for the trust property.  Id. ' 114.001.  Consequently, under the Trust Code, the
trustee is authorized to manage the property and to distribute funds to the
minors, and must exercise judgment in fulfilling her duties.  

(c)       Cases cited
by Josie are distinguishable








We are mindful of the cases cited to us by Josie that strike
down trusts for vagueness, but none of these cases involve a trust for minor
children.  City of Wichita Falls v.
Kemp Pub. Library Bd. of Trustees involved the Wichita Falls public library
and its board of directors, who disagreed with the city manager regarding the
use of the city=s tax levies for the library. 
593 S.W.2d 834, 835B36 (Tex. App.CFort Worth 1980, writ ref=d n.r.e.).  The court held that the trust was too vague
for the Board to have the power to control public funds.  Id.  In Costello v. Hillcrest State Bank of
Univ. Park, a husband took title to his wife=s homestead as Jim Costello, trustee,
without any mention of a beneficiary. 
380 S.W.2d 780, 780 (Tex. App.CDallas 1964, no writ).  The court held that there was no trust and
the mere use of the word “trustee” did not make Costello a trustee.  Id. at 782.  In Otto v. Klement, Otto and his adult
sister jointly held a checking account, a savings account, and a certificate of
deposit made payable to the sister and Otto, “Trustee.”  656 S.W.2d 678, 679 (Tex. App.CAmarillo 1983, writ ref=d n.r.e.).  At the sister=s death, Otto=s brothers and sisters claimed that
he held the money in trust for them.  The
court held that, under the circumstances, when the language was reasonably
susceptible of more than one meaning, mere use of the word Atrustee@ did not create a trust.  Id. at 682B83. 
Thus, of the cases Josie cited, we have (1) a board of directors of a
rather vague private trust that claimed the right to decide how to spend public
funds, (2) a deed of trust on a homestead property listing the husband as
trustee without naming a beneficiary, and (3) a certificate of deposit, owned
jointly by an adult brother and sister, that listed the brother as trustee
without naming a beneficiary.  In
contrast, here, we know the corpus, we know the beneficiaries, and we know with
reasonable certainty the purpose of the trustCthe care and welfare of the minor
children.

We see no reason why this sort of transaction should not
create a trust; especially in the case of a divorced parent who may not want an
ex-spouse to have complete control over money. 
Moreover, for someone who is unsophisticated or does not have the
financial resources to pay a lawyer to set up a trust, this provides a
relatively straightforward way of providing for minor children without court involvement.

In short, we sustain Barbara=s second point that the trial court
erred in holding that no trust was created by these two accounts.

2.         The Removal of Barbara as Trustee








We next turn to Barbara=s claims that the court erred in
removing her as trustee.  As noted above,
a district court has original and exclusive jurisdiction over all proceedings
concerning trusts, including proceedings to appoint or remove a trustee.  See Tex.
Prop. Code Ann. ' 115.001(3).  In
twenty-two points of error related to the trial court=s removal of Barbara as trustee, she
complains that the evidence was legally and factually insufficient to support
her removal under the specific grounds enumerated in section 113.082 of the
Texas Trust Code or for “other cause” as provided in the statute.[6]

a.         The law governing the removal of a trustee
and the standard of review

 

Section 113.082 governs the removal of a trustee and provides
in pertinent part as follows: 

(a)       A trustee may be removed . . . on the petition of an
interested person and after hearing, a court may remove a trustee . . . if:

(1)       the trustee materially violated or attempted to violate the
terms of the trust and the violation or attempted violation results in a
material financial loss to the trust;

(2)       the trustee becomes incompetent or insolvent; or

(3)       in the
discretion of the court, for other cause.

Tex. Prop. Code Ann. ' 113.082(a).








In Akin v. Dahl, the Texas Supreme Court set forth the
standard of review for the removal of a trustee.  Akin v. Dahl, 661 S.W.2d 911, 913
(Tex. 1983).  Despite the discretionary
language in subsection (3) of the statute, the Akin court instructs that
our standard of review is not abuse of discretion.  See id. (rejecting an abuse of
discretion standard of review in the removal of a trustee).  A trustee will be removed if the trier of
fact finds that the evidence shows the trustee has committed one of the
enumerated acts or an act, not enumerated, that the trial court in its
discretion deems a proper ground for removal. 
Id.; see also Lee v. Lee, 47 S.W.3d 767, 791B92 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied)  (refusing to decline to follow
the Akin Court=s construction of the statute as mandating removal even
though the plain language of the statute is discretionary in nature). 

Here, the trial court found, among other things, that Barbara
impeached herself on the stand and also entered other negative findings
relevant here. 

(21)     Barbara Nava Barrientos has made no reasonably prudent decisions
about the investing of [BCBS and the TCDRS proceeds].  In Court she was unable to state how she
would invest these proceeds.  

 

(22)     Barbara Nava Barrientos has shown no ability to administer the
[BCBS and the TCDRS proceeds] to the best interests of the children.  She has asked for the funds inappropriately
and shows lack of appropriate investment knowledge. 

_

(29)     Barbara Nava
Barrientos has shown such hostility that (a) Barbara Nava Barrientos= administrative plans (or lack
thereof) for the [BCBS and the TCDRS proceeds] have been affected, and (b)
Barbara Nava Barrientos has not been able to think and act as a fiduciary
should, both of which are ultimately detrimental to the minor children she
claims she is to protect.

The trial court=s judgment recited, among other things, that (1) Barbara “has
dealt in hostility and bad faith”; (2) Barbara was removed as “‘trustee’” and
all proceeds of the BCBS policy and TCDRS annuity were to be delivered to Josie
“as trustee for the minor children, Tyler and Brooke”; and (3) the proceeds
were monies rightfully belonging to Josie “as trustee for the minor children,
Tyler and Brooke.”  

Josie concedes in her response brief that subsections (1) and
(2) do not apply to Barbara as reasons for removing her as trustee, although
she suggests the evidence was sufficient to support removal under subsection
(2) for incompetence.  Therefore, we
consider whether the evidence supports that the trial court “in [its]
discretion” found “other cause[s]” for her removal pursuant to subsection
(a)(3).  See Tex. Prop. Code Ann. ' 113.082(a)(3).

b.         Barbara was
removed as trustee for “other cause”

The trial court=s ruling that Barbara should be
removed as trustee appears to be based on one or more of the following grounds,
each of which would fall under the third reason for removing a trustee, “other
cause”:  (1) Barbara had not made
reasonably prudent decisions regarding the investment of the trust funds and
lacked the ability to manage them in the best interest of the children; (2) she
demonstrated hostility that interfered with her ability to properly manage the
trusts; and (3) she acted in bad faith and participated in a fraud on Josie.  We will address only the first two, which we
find sufficient to support removal for other cause.  We then will turn to Barbara=s claim that a portion of the
judgment referring to “bad faith” is unsupported by the pleadings.

(1)       The ability
to manage the trust properly

The fundamental duties of a trustee include the use of the
skill and prudence that an ordinary, capable, and careful person would use in
the conduct of his own affairs and loyalty to the beneficiaries of the
trust.  Interfirst Bank Dallas, N.A.
v. Risser, 739 S.W.2d 882, 888 (Tex. App._Texarkana 1987, no writ).  Section 113.056(a) of the Texas Property Code
states the following with regard to the duties and liabilities of a trustee to
properly manage trust funds:

Unless the terms of the trust instrument provide
otherwise, in acquiring, investing, reinvesting, exchanging, retaining,
selling, supervising, and managing trust property . . . a trustee shall
exercise the judgment and care under the circumstances then prevailing that
persons of ordinary prudence, discretion, and intelligence exercise in the
management of their own affairs . . . .

Tex. Prop. Code Ann. ' 113.056(a).  There is an implied duty to invest non‑income
producing assets held in trust when there is a direction by the grantor to pay
over the interest or income to a beneficiary, Moore v. Sanders, 106
S.W.2d 337, 339 (Tex. Civ. App._San Antonio 1937, no writ), and it is
the trustee=s duty to use reasonable diligence in
so doing. McMullen v. Sims, 37 S.W.2d 141, 144 (Tex. Comm=n App. 1931, holding approved). 








In Barbara=s challenge to the trial court=s findings that she had not made
reasonably prudent decisions regarding the trusts and failed to demonstrate an
ability to manage the trust funds properly, she points to her testimony that
she actively investigated investment options, she intended to pay for the
expenses associated with an attorney or financial planner with her own funds
and expected nothing for herself, she understood her duties as trustee, and she
was a college-educated woman who had managed her husband=s law firm for twelve years.  However, Barbara admitted that, in the three
years since she learned she was a trustee of the funds, she had not come to a
decision on how to handle the funds.  Her
sole explanation for this was that she could not make a decision because the
funds were frozen due to the dispute. 
Moreover, the only plan she articulated for the funds, totaling
approximately $35,000, was to meet with someone from the trust division of a
large Houston law firm. 

Barbara=s testimony regarding her efforts to investigate investment
options also raised questions about her credibility and her ability to carry
out the fiduciary duties she owed to the beneficiaries of the trusts.  In describing the steps she had taken to
obtain legal advice on the proper management of the trusts, Barbara stated she
had telephoned someone at one of the firms, but did not remember the names of
the persons she spoke to or the hourly rate she was told she would be
charged.  When asked whether, during the
telephone conversation, she discussed the amount of money involved, Barbara
stated only that she did not discuss the matter “at any great length.”  In addition to speaking to someone at a law
firm, Barbara testified she met with a CPA (whose name she did not put on the
witness list) and someone at Chase Securities to “explore investment
possibilities.”  Barbara and Josie also
went to a bank together at one point to discuss investment options with a bank
officer.  Despite these efforts, however,
she was unable to articulate any investment strategy for the funds.








Barbara also denied ever stating that she wanted to put the
funds into a certificate of deposit.  She
testified that she did not know whether a certificate of deposit was a good
investment at that time, and testified she would need to get an opinion from
someone in the trust division of a law firm to make that determination.  She then claimed not to remember the
substance of a conversation with a BCBS representative in which, according to
BCBS records, she asked to have the policy proceeds released to her so she
could put them in a certificate of deposit. 
Nor could she remember telling BCBS representatives, as was documented
in the business records, that she was setting up or finalizing a trust.  There was no evidence Barbara ever took steps
to prepare a trust instrument. 
Additionally, Barbara filed an affidavit with the court stating that she
and her brother Reno had discussed the terms of the trust on his deathbed_a statement that was false and which was withdrawn in
an amended affidavit.[7]  

(2)       Hostility
affecting the performance of Barbara=s duties as trustee

 

In addition to her finding that Barbara could not effectively
manage the fund, the court also found that hostility affected Barbara=s ability to manage the fund.  The trial court=s recitation in the judgment that
Barbara “dealt in hostility” does not specify whether Barbara demonstrated
hostility toward the beneficiaries of the trust, her niece and nephew, or
Josie.  Barbara contends that there is no
evidence that she was hostile to the beneficiaries of the trust and it is
immaterial whether she was hostile toward Josie because she owed Josie no legal
duties.  And, in any event, Barbara
testified that she did not feel hostility toward Josie; rather, Josie felt
hostility toward her. 








Barbara relies on Akin v. Dahl for the proposition
that removal of a trustee requires a showing that (1) the trustee had hostility
toward the beneficiaries, (2) that affects or will affect the trustee=s performance in the office.  See Akin, 661 S.W.2d at 913B14. 
However, we do not read Akin to require that the hostility
affecting the trustee=s performance must be directed toward the beneficiaries.  In Akin, the Texas Supreme Court
considered whether jury findings that hostility existed between the trustee and
the beneficiaries justified the removal of the trustee.  Id. at 913B14. 
The Court held that findings of hostility between the trustee and the
beneficiaries, standing alone, was insufficient; there must be an affirmative
finding that the trustee=s ill will or hostility does or will affect the performance
of the trustee=s duties.  Id. at 914.  We find nothing in the case that suggests
that hostility must be directed toward the beneficiaries of the trust.  Indeed, given the Court=s admonition that “[p]reservation of
the trust and assurance that its purpose be served is of paramount importance
in the law,” we find that all circumstances affecting the trustee=s ability to perform her duties may
be considered.  See id.

Here, Barbara testified that any hostility between them
originated with Josie, while Josie testified that Barbara was hostile toward
her.  Josie=s and Barbara=s version of various events likewise
differed substantially.  For example,
Josie testified that Barbara had initially agreed to turn over the TCDRS funds
to Josie as child support.  The evidence
showed that Josie sent Barbara a letter in April of 1998 attaching a proposed
Qualified Domestic Relations Order for her signature to complete the
transaction.  However, Barbara refused to
sign it, claiming at trial that she had never agreed to turn over the funds,
and she thought it was an improper ultimatum. 
Josie testified that Barbara did not speak to the children, but Barbara
testified that she avoided contact with the children because she did not want
her actions to be misconstrued as trying to “influence the other side.”

Barbara also testified that Josie rebuffed numerous friendly
overtures toward the children, but Josie=s testimony contradicted Barbara=s. 
Barbara described one incident in which she claimed that she tried to
visit the children at Easter, but Josie would not let her in the apartment and
made them “spend Easter in the parking lot” of the apartment complex.  According to Josie, however, Barbara had
telephoned her and said she had some Easter baskets for the children, but was
in a hurry, so when she arrived, the children met with her in the parking lot
for about fifteen minutes.  Another time,
Barbara testified, her mother told her that she had sent the children Christmas
gifts, but Josie returned them.  Josie
testified that she never rejected any gifts for the children.  These disparate exchanges demonstrate the
existence of hostility or ill will between the two women.








Most troubling, however, was Barbara=s conduct toward Josie after she
learned that her brother, Reno, had failed to designate his children as the
beneficiaries of the KOC policy as ordered in Reno and Josie=s divorce decree.  The evidence showed that shortly after Reno=s death, Barbara and her mother,
Margaret, met at a restaurant with a KOC representative, and Margaret filled
out and signed a form to claim the proceeds. 
At trial, Barbara claimed she did not remember any forms being filled
out while at the restaurant, but recanted after she was confronted with the
signed and dated form.  

Barbara learned in December 1997 that Josie believed the KOC
policy proceeds belonged to the children. 
When Josie specifically asked about the status of the policy, Barbara
did not tell her what she knew, but said only that Josie should discuss the
matter with Margaret.  According to
Barbara, she did not know at that time whether Margaret had actually received
the KOC policy proceeds (although she knew Margaret was seeking them), and her
only explanation for failing to say anything to Josie was that she thought
Josie should take the matter up with Margaret directly.  At the Christmas party for the children,
Josie showed Barbara the divorce decree containing the order that Reno
designate the children as beneficiaries of the KOC policy as additional child
support.  Barbara also learned that
Margaret had spent approximately half of the benefits.  After the party, Barbara told Josie she would
try to resolve the situation with Margaret. 
Josie testified that she talked to Barbara several times over the next
week or two, but Barbara informed her she was having difficulty reaching her
mother.  Barbara testified that her
mother never returned her phone calls, so she dropped the matter.[8]  By the time Josie filed her lawsuit and the
funds were located, only $10,000 of the policy proceeds remained.








This testimony involved the credibility and demeanor of the
witnesses.  The trial court was in the
best position to determine who it believed and whether the degree of hostility
between Barbara and Josie did or would affect Barbara=s ability to manage the trusts in the
children=s best interest.  The trial court was clearly concerned about
Barbara=s willingness to permit Margaret to
continue to deplete the KOC proceeds when she knew that the money was supposed
to be for the children as additional child support.  Among the court=s findings of fact was the finding
that Barbara “deliberately misled Josie” and thereby “delayed her taking action
to stop the spending of the insurance until [Barbara=s] mother, Margaret Nava, had spent
all but $10,000.00 of the $53,004.74 she received from the [KOC policy].” 

c.         Inability to manage and hostility support removal for other
cause

As the sole judge of the credibility of the witnesses and the
weight to be given their testimony, a trial court=s findings will not be disturbed if
there is evidence of probative force to support them.  See Benoit v. Wilson, 150 Tex. 273,
281, 239 S.W.2d 792, 796B97 (Tex. 1951); Tigner v. City of Angleton, 949 S.W.2d
887, 889 (Tex. App.CHouston [14th Dist.] 1997, no writ).  While it is true that a wide measure of
discretion is accorded to a trustee in the prudent operation of a trust, see
Tomlinson, 960 S.W.2d at 339, the trial court could reasonably have
concluded, in its discretion, that Barbara=s inability to reach any decision
regarding a proper investment strategy in anticipation of the possible release
of the funds, after three years, demonstrated an inability to make prudent
decisions or manage the funds in the best interest of the children.  See Moore, 106 S.W.2d at 339
(holding lack of business experience may be considered on question of removal
of trustee); see also Burnett v. Smith, 240 S.W. 1007, 1010 (Tex. Civ.
App.CFort Worth 1922, no writ) (stating
that a court of equity has the power to remove a trustee upon a proper showing
of unfitness).  








The court also could have concluded that hostility existed
between the two women as evidenced in two ways: 
first, by Barbara=s failure to reveal to Josie what she knew about the KOC
policy and second, by the fact that Barbara=s and Josie=s testimony was so completely
contradictory in many areas.  Barbara
and Josie gave so much contradictory testimony that an appellate court would
never be able to resolve it; we find it hard to conceive of the case in which
we could ignore the trial court=s own credibility decisions with so much contradictory
testimony.  Having found this
hostility to exist, the court could have concluded that it would impair Barbara=s ability to disburse the funds in a
manner consistent with the children=s best interests.  See Tex.
Prop. Code Ann. ' 113.082(a)(3); Akin, 661 S.W.2d at 913B14; Moore v. Sanders, 106
S.W.2d at 339 (finding evidence of lack of business experience, antagonism
towards mother of beneficiaries, and other grounds, taken together, sufficient
to remove trustee).  

In short, we find that the evidence is sufficient to support
the trial court=s removal of Barbara as trustee under subsection 113.082(3)
for “other cause,” and we conclude that the trial court did not err in removing
Barbara as trustee for “other cause.” 

d.         The reference in the judgment that Barbara acted in bad
faith must be removed

Barbara also contends that the trial court=s findings of fact and conclusions of
law relating to bad faith and Barbara=s participation in a fraud on Josie
are not supported by the pleadings or the evidence.[9]  She also contends that the allegation of bad
faith in the judgment is not supported by Josie=s pleadings.  In response, Josie challenges Barbara=s characterization of the evidence,
but does not challenge Barbara=s assertion that the recitation of Abad faith@ in the judgment is not supported by
Josie=s pleadings.  








The judgment recites the following:  “There is evidence before the Court that
Barbara Nava Barrientos . . . has dealt in hostility and bad faith.”  Although Josie=s petition and the evidence support
the conclusion that Barbara “dealt in hostility” toward Josie, Barbara is
correct that Josie=s petition does not allege that Barbara acted with bad faith
or violated a fiduciary duty.  Therefore,
we order the sentence=s reference to “bad faith” stricken from the judgment as
unsupported by the pleadings, and we strike the remainder of the sentence as
unnecessary to the judgment.  See Tex. R. Civ. P. 301 (judgment shall
conform to the pleadings and proof). 
Thus, this entire sentence shall be stricken from the judgment.

3.         Substituting
Josie as Trustee

We now turn to Barbara=s claim that the trial court erred in
substituting Josie Moreno as trustee. 
Barbara claims Josie was not diligent in protecting the KOC policy and
obtaining the proceeds for the children. 
She also complains that the evidence is insufficient to support the
trial court=s finding of fact that Josie was “business-like,
has knowledge of appropriate investments and has demonstrated her capabilities,@ and had Amade direct and prudent requests of
Barbara Nava Barrientos.”  Additionally,
citing Brault v. Bigham, 943 S.W.2d 576, 579 (Tex. App.CWaco 1973, writ ref=d n.r.e.), Barbara contends that
Josie should be disqualified from serving as trustee because she sought the
TCDRS annuity for her own use.  We
disagree.

a.         The evidence
supports Josie=s substitution

A court may remove or appoint a trustee when it becomes
necessary for the protection and preservation of the trust.  Brault v. Bigham, 493 S.W.2d at 579; Republic
Nat. Bank & Trust Co. v. Bruce, 130 Tex. 136, 139, 105 S.W.2d 882, 884
(1937) (“The safety of the trust fund is the first care of the law, and on this
depends every rule which has been made for the conduct of trustees.”).  Having determined that the evidence
demonstrated that Barbara must be removed as trustee, the trial court was
obliged to find someone to replace her as trustee.  The trial court determined that Josie, the
children=s mother, was an appropriate
replacement.  We agree.








As the children=s mother, Josie was in the best
position to ascertain the children=s needs and was therefore a logical
choice.  Josie was the party deprived of
the additional child support the KOC policy was to provide, and substituting
her as trustee gave her control over the trust funds for the benefit of the children.  Notably, Barbara does not suggest an
alternative, and certainly neither Margaret nor Barbara=s sister, Janet, would be appropriate
substitutes under the circumstances.  

Moreover, contrary to Barbara=s claim, we find sufficient evidence
to support the trial court=s findings that Josie demonstrated an ability to invest the
monies on behalf of the children and had made “direct and prudent” requests of
Barbara.  When asked about how she
thought the funds should be invested, Josie testified that she was “very
conservative” and did not invest in stocks. 
Josie testified that she thought the Texas Tomorrow Fund was a good way
to provide for the children=s college education, and she had submitted applications for
the children; but, when she was unable to turn over the funds, her application
was canceled.  It was undisputed that
Josie spoke with Barbara regularly regarding Barbara=s handling of the BCBS policy and the
TCDRS annuity, and that the two of them met with a bank officer at one point to
discuss investment options.  It was also
undisputed that Josie had her attorney draft documentation for Barbara=s signature to permit the TCDRS
annuity funds to be used as child support (the parties disagree about whether
Barbara initially consented to the arrangement), which Barbara later refused to
sign.  Despite Barbara=s characterization of Josie=s request as an improper ultimatum,
it does not appear unreasonable or imprudent, given the loss of the additional
child support the KOC policy was to provide.








Barbara contends, however, that Josie is not a suitable
trustee because she was not diligent in protecting the KOC proceeds for the
children.  Specifically, Barbara
criticizes Josie for (1) failing to demand written confirmation that Reno had
designated the children the beneficiaries of the KOC policy after the divorce,
and (2) failing to contact KOC directly after Reno died, and instead relying on
Barbara.  While Josie may not have acted
as aggressively as Barbara claims she should have, the record shows Josie made
efforts to confirm that Reno had complied with the divorce decree, and she relied
on Barbara because Barbara was the trustee of the BCBS policy and the TCDRS
annuity and spoke to her regularly about them. 
While Josie may have been mistaken to assume that Barbara was handling
the KOC policy as well, Barbara=s actions after Josie specifically asked about the policy
hindered Josie=s efforts to obtain the money for her
children.  When Josie specifically asked
Barbara about the status of the KOC policy, Barbara did not tell Josie that she
knew Margaret was claiming the funds as the named beneficiary, but said only
that Josie should speak to Margaret about it. 
When Josie learned the KOC policy benefits had been paid to Margaret and
half of the money was already spent, Josie also relied on Barbara to try to
resolve the matter with Margaret. 
Barbara, however, admittedly “dropped the matter” when Margaret did not
return her calls.  By the time Josie
filed suit and the money was located, only $10,000 remained.[10]


Barbara also argues that Josie should be disqualified as
trustee because she “demanded” that Barbara sign the documentation directing
that the TCDRS annuity be paid to her as “support” and later sued to obtain the
money for use toward “basic living expenses.” 
However, the evidence shows that Josie was attempting to remove Barbara
as trustee of the TCDRS annuity so that the money could be used for child
support, not her individual use. 
Moreover, Josie sought the money to substitute for the lost KOC policy
proceeds, which had been designated as additional child support. 

Given the totality of the circumstances, we do not find it
arbitrary or unreasonable that the trial court substituted Josie as trustee. 

b.         The case law
supports this decision 








The case of Moore v. Sanders supports this
conclusion.  In Moore, the mother
of two children brought suit to replace the trustee of a fund left to the
children by the father, who was deceased. 
Moore, 106 S.W.2d at 338. 
The court of appeals upheld the appointment of the mother as trustee
because she sought “nothing for herself,” but wanted only to charge the fund
with unexpected medical expenses incurred by the children and a monthly
allowance for the education and maintenance of the children.  Id. at 338B39. 
The court reasoned that the mother=s intent was not to divest her minor
children of any of the trust fund, but rather, to recover it for them.  Id. at 339.  

We find the facts of Moore indistinguishable from the
case at hand.  Here, the trial court, as
the sole judge of the credibility of the witnesses and the weight to be given
their testimony, decided that it was in the best interest of the children to
remove Barbara as trustee and place Josie in her stead.  In so doing, the trial court did not divest
the beneficiaries of title to the trusts, but rather, protected the trusts from
mismanagement.  See id. 

We also find Barbara=s reliance on Brault
misplaced.  In Brault, a husband
and wife were killed in an airplane crash, leaving four minor children.  Brault, 493 S.W.2d at 577.  The husband=s mother was designated as a
secondary beneficiary (after the wife) of the husband=s life insurance policy.  Id. 
The wife=s sister became guardian of the minor children, and in that
capacity, she sued the insurance company and the mother for the proceeds, claiming
that the mother was named as a beneficiary only as a trustee for the
children.  Id.  In response, the mother sought to recover the
proceeds individually, but she later abandoned that claim and sought to recover
the funds as “custodian@ for the children” but “free from the control of any
guardian, administratrix, probate court or other
outside agency.”  Id. at 577B78. 
On appeal, the court stated that a trustee=s intention or attempt to appropriate
trust funds for her own use constituted a breach of trust, and held that the
trial court did not abuse its discretion in removing the mother as
trustee.  Id. at 579.  We find the circumstances here materially
different than the situation in Brault. 


Accordingly, we conclude that the trial court did not err in
appointing Josie as trustee of the BCBS and the TCDRS proceeds; Barbara=s complaint on this matter is
overruled.  

C.        Trial
Court Bias








Lastly, Barbara contends that the trial court was swayed by
improper bias against her.  For this
proposition, she cites Metzger v. Sebek, 892 S.W.2d 20, 37B39 (Tex. App.CHouston [1st Dist.] 1994, writ
denied).  Metzger holds that to
reverse a judgment for improper conduct or comments of the judge, an appellate
court must find that judicial impropriety was in fact committed and the
complaining party was probably prejudiced.  Id. at 39. 
The scope of our review is the entire record.  Id.  We note that “‘judicial remarks during the
course of a trial that are critical or disapproving of, or even hostile to,
counsel, the parties, or their cases, ordinarily do not support a bias or
partiality challenge.’”  Dow Chem. Co.
v. Francis, 46 S.W.3d 237, 240 (Tex. 2001) (citing Liteky v. United States,
510 U.S. 540, 555, 114 S. Ct. 1147, 127, L. Ed.2d 474 (1994).  Such remarks may constitute bias if they
reveal an opinion deriving from an extrajudicial source; however, when no
extrajudicial source is alleged, such remarks will constitute bias only if they
reveal such a high degree of favoritism or antagonism as to make fair judgment
impossible.  See Ludlow v. DeBerry,
959 S.W.2d 265, 271 (Tex. App.CHouston [14th Dist.] 1997, no writ) (citing Liteky,
510 U.S. at 554B56).

We have examined the entire record and conclude that Barbara
has failed to demonstrate judicial impropriety that resulted in harmful
error.  And, as in Metzger, we
decline to unnecessarily lengthen this opinion with a review of each exchange
Barbara identifies in her brief, because no useful purpose would be served by
do so.  See Metzger, 892 S.W.2d at
39.  Clearly, this judge had strong
opinions about Barbara.  However, these
opinions were based on the testimony and evidence the judge heard and saw
during the trial.  This is not grounds
for improper bias.  We overrule this
complaint.  

Conclusion








In sum, we hold that the trial court had jurisdiction to hear
the support matters initially brought before it and that, having already
acquired jurisdiction over some of the parties and property in dispute, it had
jurisdiction in its capacity as a district court to hear and adjudicate the
party and property later added.  We hold,
contrary to the trial court, that Reno Nava intended the TCDRS and BCBS
accounts to be held in trust for his two children, with Barbara as
trustee.  We also hold that the evidence
supports the court=s decision to remove Barbara as trustee and to name Josie
trustee for the accounts for the benefit of her children.[11]  Finally, we strike the reference in a
sentence of the judgment to “bad faith” as unsupported by the pleadings, and we
strike the remainder of the sentence as unnecessary to the judgment.  The judgment of the trial court is affirmed
as modified.  

 

 

/s/        Wanda McKee Fowler

Justice

 

 

 

Judgment rendered
and Opinion filed December 5, 2002.

Panel consists of
Justices Hudson, Fowler, and Murphy.[12]

Publish C Tex.
R. App. P. 47.3(b).

 

 











[1]  The
decree also provided that Reno=s
child support obligations would not terminate on his death.





[2]  Reno=s father pre-deceased him, so the proceeds were paid
solely to Margaret.





[3]  The actual
claim is that the court did not have jurisdiction over Margaret, Barbara or
Janet, but Margaret and Janet, having settled with Josie before trial, are no
longer parties and not involved in this appeal. 
As a result, we will consider this claim as it relates to Barbara.  





[4]  Because of the
unique circumstances of this case, the court=s
jurisdiction does not depend on Barbara=s
presence as a party to the divorce proceeding. 
Moreover, because of the support issue, only the family court had
jurisdiction to hear all of the issues together.  Neither a civil district court nor a probate
court could hear the support issue.  So,
our policy of promoting judicial economy also supports a conclusion that the
family court should hear the whole case.





[5]  A
tentative draft of the Restatement (Third) of Property also recognizes that
designations of beneficiaries on life insurance policies and employee benefit
accounts are inter vivos donative transfers.  See Restatement (Third) of Property '
7.1 & cmts. a, c, d (Tentative Draft No. 3, 2001).  As that document states, designations like
those here Aeffect a
present transfer of a nonpossessory future interest or contract right, the time
of possession or enjoyment being postponed until the donor=s
death.@  See id. cmt. a.





[6]  Barbara=s complaints are primarily directed to findings
relating to fraud, bad faith, hostility, and Barbara=s ability to administer the trust.  Barbara contends that there is legally and
factually sufficient evidence to support certain findings, certain findings are
immaterial, and certain of the trial court=s
conclusions of law are erroneous.  We
need not address each issue separately; rather, we determine whether  the evidence is sufficient to support the
trial court=s judgment removing Barbara and substituting Josie as
trustee.  See
Moore v. Sanders, 106 S.W.2d at 339 (declining to address
appellant=s theories
individually in action to reverse her removal as trustee). 





[7]  Barbara
testified that she signed the affidavit containing the incorrect statement
because she read it very quickly.  





[8]  Barbara
testified that she was not involved in her mother=s
business and did not know how she spent the money.  However, she also admitted she talked to
Margaret several times a month.





[9]  Because
we have already determined that the first two reasons discussed are sufficient
to support Barbara=s removal, we
will not address the sufficiency of the evidence supporting these challenged
findings and conclusions.





[10]  Barbara also
complains that Josie was not diligent because she did not file suit until three
months after Barbara told her she was having no success in her efforts to speak
to Margaret.  At the same time, however,
Barbara complains that she was never able to invest the trust funds because
Josie sued her before she could do so.





[11]  We did not
discuss Barbara=s third broad issue alleging that the court improperly
imposed a constructive trust on the TCDRS and BCBS funds.  However, this issue and its sub parts are
moot in light of our conclusion that Reno Nava placed these accounts in trust
for his children.





[12]  Senior Chief
Justice Paul Murphy, participating by assignment.